APPEAL NO. 23-12752-G

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

NICHOLAS S. BOLTON,

Plaintiff-Appellant,

v.

LENN WOOD, Sheriff of Coweta County,
Georgia, a political subdivision of the State
of Georgia; JOHN TAYLOR COLLINS,
CHRISTIAN SPINKS; and JON HOUSE;

Defendant-Appellees.

Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-CV-02279-MHC

_____

**BRIEF OF APPELLANT**

_____

James W. Howard
Attorney for Appellant
Georgia Bar No. 370925

THE HOWARD LAW FIRM, PGC.
Suite 200, Kyleif Center
1479 Brockett Road
Tucker, Georgia 30084
(770) 270-5080
(770) 270-5033 fax
jhoward@howardfirm.com

*Bolton v. Wood, et al.,* No. 23-12752-G

## APPELLANT'S CERTIFICATE OF INTERESTED
## PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and the corresponding Eleventh Circuit Rules, I hereby certify on behalf of Appellant NICHOLAS S. BOLTON that the following persons and entities have an interest in the outcome of this particular case or appeal:

| | |
|---|---|
| Bolton, Nicholas S. | Plaintiff-Appellant |
| Cohen, The Hon. Mark H. | United States District Judge |
| Collins, John Taylor | Appellee |
| Coweta County, Georgia | Affiliated with Defendant-Appellees |
| Coweta County Board of Commissioners, Georgia | Affiliated with Defendant-Appellees |
| Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP | Counsel for Defendant-Appellees |
| Hanover Insurance Group – THG | Insurer for Appellees |
| House, Jon | Defendant-Appellee |
| Howard, James W. | Attorney for Plaintiff-Appellant |
| Howard, Leif A. | Attorney for Plaintiff-Appellant |
| Howard, Sharon Effatt | Attorney for Plaintiff-Appellant |
| NOVA Casualty Co. | Insurer for Appellees |

C-1 of 2

*Bolton v. Wood, et al.,* No. 23-12752-G

| | |
|---|---|
| Spinks, Christian | Defendant-Appellee |
| State National Insurance Co., Inc. | Insurer for Appellees |
| The Howard Law Firm, PGC. | Counsel for Plaintiff-Appellant |
| Wood, Lenn | Appellee |
| Woodward, Karen E. | Attorney for Defendant-Appellees |

/s/ *James W. Howard*

James W. Howard
Attorney for Plaintiff-Appellant
Georgia Bar No. 370925

THE HOWARD LAW FIRM, PGC.
Suite 200, Kyleif Center
1479 Brockett Road
Tucker, Georgia 30084
(770) 270-5080
(770) 270-5033 fax
jhoward@howardfirm.com

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant NICHOLAS S. BOLTON requests oral argument on the issues raised in this appeal of a summary judgment granted to the defendants in a civil rights action based on 42 U.S.C. § 1983 and an excessive use of deadly force. Appellate counsel's knowledge of the district court record and specific facts of this case may assist this Court in resolving these issues.

The appellate decision in this case will be critical to setting the parameters of qualified immunity for law enforcement officers using deadly force against unarmed citizens. The previously established prerequisites for an officer to use deadly force were confirmed in *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016). In this appeal, the federal district court order misconstrued the evidence to abandon these requirements. As written, the order authorizes officers to use deadly force against the driver of any motor vehicle while the engine is running, even if 1) the vehicle is immobilized, 2) the driver is not armed or violent, and 3) the driver is not given a feasible warning or opportunity to turn off the engine to his vehicle before he is shot.

The officers were granted summary judgment under these circumstances despite evidence that they deliberately intimidated, chased, and shot the plaintiff. Unless this Court reviews the evidence *de novo* and reverses the judgment, this case will justify tragic incidents that could be avoided if officers merely comply with established policies, police practices, and training.

iv

# <u>TABLE OF CONTENTS</u>

Certificate of Interested Persons and Corporate Disclosure Statement ……….…ii

Statement Regarding Oral Argument ……………………………………………iv

Table of Contents ...........................................………….………v

Table of Citations ...........................................……………....vi

Statement of Subject-Matter and Appellate Jurisdiction ……………………..…..1

Statement of the Issues ...……………………………………………………..1

Statement of the Case …………………………………………………...…3

     1. District Court Proceedings and Disposition ………………………..……...3

     2. Statement of the Facts ……………………………………………...…4

     3. Standard and Scope of Review ……………………………….……..17

Summary of the Arguments ………………………………………………18

Argument and Citations of Authority ……………………………………….22

    A. THE DEPUTIES ARE ARGUABLY LIABLE FOR USING
       EXCESSIVE, DEADLY FORCE BECAUSE QUALIFIED
       IMMUNITY DOES NOT APPLY TO A VIOLATION OF
       CLEARLY ESTABLISHED LAW AND SHERIFF POLICIES…………..22

     1. The initial stop was lawful, but intentionally conducted
       in an unlawful, threatening, and confusing manner……………….……25

     2. The Tahoe chase was an unjustified, dangerous violation
       of proper police practices and CCSO vehicle pursuit policy……………29

     3. The PIT maneuver was dangerous, unauthorized,
       unjustified, and prohibited by a written CCSO policy……………….……31

4.  Deputy Collins unreasonably and unjustifiably
    used excessive, deadly force in shooting Bolton…………………….…..33

5.  Deputy Spinks used excessive force against Bolton……………………38

6.  Deputy House failed to intervene…………………………………….…39

7.  The deputies' false statements provide evidence that they
    knowingly and intentionally violated Bolton's civil rights………..…....40

B.  THE COUNTY SHERIFF IS ARGUABLY LIABLE IN
    HIS OFFICIAL CAPACITY FOR THE ALLEGED CIVIL
    RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983………………..…...46

C.  BOLTON STATED VIABLE STATE LAW ASSAULT
    AND BATTERY CLAIMS AGAINST THE DEPUTIES………………...49

Conclusion ………………………………………………...……………..50

Certificate of Compliance …………………………………………….……..51

Certificate of Service ……………………………………………………..…52

## **TABLE OF CITATIONS**

UNITED STATES CONSTITUTION

Fourth Amendment ……………………………………….…….…..18, 23

FEDERAL STATUTES

28 U.S.C. § 1291 …………………………………………………………1

42 U.S.C. § 1983 ………………………………………….……iv, 1, 23

FEDERAL RULES OF APPELLATE PROCEDURE

Rule 4(a) ………………………………………………...……………..…1

Rule 26.1 …………………………………………………………………..ii

Rule 27(d)……………………………………………………………………51

GEORGIA STATUTES

O.C.G.A. § 16-11-36(a)…………………………………………………....25

O.C.G.A. § 16-11-6(b)…………………………………………………….....26

CASES

*Anderson v. Creighton,* 483 U.S. 635 (1987)…………………………….….18, 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1985)……………………………17

*Board of County Commissioners v. Brown,* 520 U.S. 397 (1997)……………..…46, 47

*Cast Steel Products, Inc. v. Admiral Ins. Co*., 348 F.3d 1298 (11th Cir. 2003)…..17

*Dukes v. Miami-Dade County*, 232 Fed.Appx. 907 (11th Cir. 2007)………………39

*Ensley v. Soper*, 142 F.3d 1402 (11th Cir. 1998)…………………………….…..39

*Gainor v. Douglas County, Georgia,* 59 F.Supp.2d 1259 (N.D.Ga. 1998)……...…23

*Graham v. Conner*, 490 U.S. 386 (1989)……………………………………….…23

*Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008)……………….………………38

*Hall v. McGhee*, 762 Fed.Appx. 837 (11th Cir. 2019)…………………………36, 38

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982)…………………………………….24

*Helm v. Rainbow City*, 989 F.3d 1265 (11th Cir. 2021)……………………………39

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002)………………………………..24, 37

*Livadas v. Bradshaw*, 512 U.S. 107 (1994)……………………………………….23

*Matthews v. Columbia County,* 294 F.3d 1294 (11th Cir. 2002)……………..……46

*McCullough v. Antolini*, 559 F.3d 1201 (11th Cir. 2009)…………………………..35

*Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978)……46

*Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013)………………...…33,34, 50

*Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009)……………………………...23, 24

*Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002)………………………………35

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)………………………………46

*Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016)….iv, 17, 24, 33, 34, 36, 37, 50

*Rand v. Lavoie*, No. 14-cv-570-PB, 2017 U.S.Dist.Lexis 142755 (D.N.H. 2017)…36

*Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005)…………………..….…35

*Sheth v. Webster*, 145 F.3d 1231 (11th Cir. 1998)………………….………..24

*Small v. Glynn County*, 77 F.Supp.3d 1271 (S.D.Ga. 2014), *aff'd sub nom,*
    *McGhee v. Glynn County*, 598 Fed.Appx. 752 (11th Cir. 2015)…….……..35

*Spencer v. City of Orlando*, 725 Fed.Appx. 928 (11th Cir. 2018)…………..…..35

*Terrell v. Smith*, 668 F.3d 1244 (11th Cir. 2012)…………………………….…..35

*Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998)……………..…..24

*Touchton v. Bramble*, 284 Ga.App. 164, 643 S.E.2d 541 (2007)………...….49, 50

*Webb v. State*, 256 Ga. App. 653, 569 S.E.2d 596 (2002)…………………..…..35

*Williams v. Matthew Sirmons*, 307 Fed.Appx. 354 (11th Cir. 2009)………….36, 39

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The Eleventh Circuit Court of Appeals has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4(a). This is an appeal of a federal civil rights claim asserted pursuant to 42 U.S.C. § 1983. The appellant has a right to pursue this direct appeal of a final summary judgment in this civil case in the United States District Court for the Northern District of Georgia.

Appellant's notice of appeal was timely filed on August 14, 2023, within 30 days after the order granting summary judgment and the corresponding judgment were filed in the federal district court on July 18, 2023. The final judgment disposed of all parties' claims in this criminal prosecution in the federal district court.

## STATEMENT OF THE ISSUES

1.    Whether sheriff deputies are entitled to summary judgment based on qualified immunity in a federal civil rights action despite evidence that the deputies investigated whether the plaintiff was loitering without seeking any relevant information; induced the plaintiff to flee by threatening him with arrest and refusing to explain why he was instructed to exit from his parked vehicle; then aimed firearms at the plaintiff's head as he drove away from the parking lot.

2.    Whether sheriff deputies are entitled to summary judgment based on qualified immunity in a federal civil rights action despite evidence that the deputies

initiated an unauthorized vehicle chase of the plaintiff and immobilized his vehicle by performing a dangerous, unjustified, and unauthorized "precision immobilization technique" or "pursuit intervention tactic" (PIT maneuver).

3.      Whether sheriff deputies are entitled to summary judgment based on qualified immunity in a federal civil rights action despite evidence that the deputies used deadly force to shoot the plaintiff in the head without giving him a feasible advance warning or opportunity to turn off his engine while the plaintiff was sitting in an immobilized vehicle without posing a threat to anyone.

4.      Whether a sheriff deputy is entitled to summary judgment based on qualified immunity in a federal civil rights action despite evidence that the deputy used excessive, unnecessary force on the critically wounded and helpless plaintiff.

5.      Whether a county sheriff, sued in his official capacity, is entitled to summary judgment based on sovereign immunity in a federal civil rights action despite evidence that he a) failed to train deputies to investigate a criminal offense, b) failed to enforce training to de-escalate potential conflicts with motor vehicle drivers, c) failed to enforce policies on vehicle pursuits, d) failed to enforce policies on PIT maneuvers, and e)failed to enforce policies on the use of deadly force.

6.      Whether sheriff deputies are entitled to summary judgment on state law claims for assault and battery despite evidence that the deputies acted with actual malice and intent to injure the plaintiff.

2

## STATEMENT OF THE CASE

### 1.    District Court Proceedings and Disposition

On June 2, 2021, Plaintiff-Appellant NICHOLAS S. BOLTON ("Bolton") filed a Complaint initiating this civil rights and tort action in the United States District Court for the Northern District of Georgia, Civil Action No. 1:21-CV-02279-MHC. Bolton alleged excessive force claims against law enforcement officers based on 42 U.S.C. § 1983 and Georgia state law. Doc 1.

On June 24, 2021, Defendant-Appellees LENN WOOD ("Sheriff Wood"), Sheriff of Coweta County, Georgia, a political subdivision of the State of Georgia; JOHN TAYLOR COLLINS ("Deputy Collins"), and JON HOUSE ("Deputy House") jointly filed their answer to the Complaint. Doc 12.

On July 23, 2021, Defendant-Appellee CHRISTIAN SPINKS ("Deputy Spinks") filed his answer to the Complaint. Doc 18.

On June 10, 2022, Bolton filed the Expert Report of Andrew J. Scott, III, an expert witness on police practices, police training, and use of force. Doc 40.

On June 30, 2022, Bolton filed the Expert Report of Curtis Marshall, an expert witness on police practices, police training, and use of force. Doc 43.

On January 4, 2023, Defendant-Appellees filed a motion for summary judgment with a supporting brief and exhibits. Doc 74.

3

On February 18, 2023, Bolton filed a response to the defense motion for summary judgment with a supporting brief and exhibits. Doc 85.

On March 16, 2023, Defendant-Appellees filed a reply brief in support of their motion for summary judgment. Doc 90.

On July 18, 2023, United States District Judge Mark H. Cohen issued an *Order* granting summary judgment to Defendant-Appellees. Doc 93. The district court clerk promptly issued a judgment in favor of Defendant-Appellees. Doc 94.

On August 14, 2023, Bolton filed a *Notice of Appeal*. Doc 95.

2.    <u>**Statement of the Facts**</u>

Bolton is a 37-year-old black male born in Newnan, Georgia. Bolton was raised and currently lives in Hogansville, Georgia. Doc 70 – Pg 7-11.

On June 30, 2019, Sheriff Wood was the Sheriff of Coweta County, Georgia, a political subdivision of the State of Georgia. Deputy Collins, Deputy Spinks, and Deputy House were all deputy sheriffs employed with the patrol division of the Coweta County Sheriff's Office (CCSO). Doc 74-2 – Pg 2-3, ¶¶ 11-14; Doc 74-3 – Pg 2, ¶ 2; Doc 85-2 – Pg 1-2, 5-6, ¶¶ 1-3, 11-14.

In June 2019, Bolton was homeless, buto he owned and lived in his white 2001 Chevrolet Tahoe SUV ("the Tahoe") while he picked up odd jobs and begged for handouts in Newnan. At night, Bolton parked the Tahoe to sleep in the enormous vacant parking lots used by retail establishments in the Newnan Pavilion. The

Newnan Pavilion is a prominent, privately owned shopping center located in Coweta County, Georgia. Doc 70, Pg 7-11; Doc 74-3, Pg 7, ¶ 17; Doc 85-2, Pg 1-2, ¶¶ 1-3.

On June 29, 2019, Bolton parked the Tahoe in a remote section of the Newnan Pavilion parking lot used by the Kohl's store. Bolton was sitting on the Tahoe bumper at about 11:00 a.m. when CCSO Deputy George Thompson approached and initiated a pleasant conversation with Bolton. Bolton readily answered questions and produced his driver's license so Deputy Thompson could verify Bolton's identity and his ownership of the Tahoe. Doc 77-2 – Pg 3, ¶ 1; Doc 70 – Pg 18-19; Doc 82-FD;[1] Doc 85-5; Doc 85-6.

Deputy Thompson also verified that Bolton was living and sleeping in the Tahoe in the parking lot. Deputy Thompson told Bolton that he was "fine" while parked at that location. Deputy Thompson encouraged Bolton to seek employment at the retail establishments in the Newnan Pavilion while he was parked in the lot.[2] Doc 70 – Pg 18-19; Doc 77-2 – Pg 3, ¶ 2; Doc 82; Doc 85-5; Doc 85-6.

---

[1] Deputy Thompson's body-worn camera (BWC) produced this audio/video recording of his interaction with Bolton in the parking lot. The notice of filing this recording is Doc 82, but the actual recording was transmitted to this Court on an undocketed flash drive identified herein as Doc 82-FD.

[2] The district mentioned "No Loitering" signs posted in the area. Doc 83 – Pg 2. However, the signs are immaterial because Bolton was allowed to park in the lot, there were no complaints, Bolton was not loitering, and the deputies never even investigated whether Bolton was loitering.

Deputy Thompson reported his interaction with Bolton to the CCSO dispatch office. Deputy Thompson had no negative impressions or concerns about Bolton or his presence in the parking lot. After their conversation, Deputy Thompson never considered arresting Bolton for loitering. Deputy Thompson verified Bolton's identity and found no reason to suspect he was in the parking lot for any illegal purpose. Doc 82; Doc 85-5; Doc 85-6.

On June 30, 2019, at 2:22 a.m., Deputy Collins found the Tahoe parked at the same remote location in the parking lot. Deputy Collins never received any complaints about the Tahoe being at the location. Deputy Collins never attempted to verify "whether any other deputy had called in or communicated with someone in the Tahoe." Deputy House came to the scene as back up before Deputy Collins approached the Tahoe and saw Bolton asleep in the rear cargo area. Doc 70 – Pg 29, 37; Doc 72 – Pg 60; Doc 73 – Pg 94, 297; Doc 75-FD2; Doc 75-FD3;[3] Doc 85-7; Doc 85-8.

---

[3] The body-worn cameras (BWCs) of Deputy Collins and Deputy House produced two (2) audio/video recordings of interactions with Bolton in the parking lot. The notice of filing these recordings is docketed as Doc 75, but the actual recordings were transmitted to this Court on an undocketed flash drive. The first recording on this flash drive is a recorded statement by Bolton identified as Doc 75-FD1. The second recording is from the BWC of Deputy Collins identified as Doc 75-FD2. The third recording is from the BWC of Deputy House identified as Doc 75-FD3.

Deputy Collins asked Bolton to open a window and produce identification. Deputy Collins assured Bolton that Deputy Collins just needed to check Bolton's ID before he left because Bolton was loitering. Bolton explained that he had recently spoken to two (2) other officers, but he promptly moved up into the driver's seat and retrieved his driver's license.[4] Doc 69 – Pg 60; Doc 72 – Pg 68; Doc 73 – Pg 95-96, 99-100, 102; Doc 75-FD2; Doc 75-FD3; Doc 85-7; Doc 85-8.

Bolton retrieved his driver's license, but the deputies never even looked at it.[5] Instead, Deputy Collins told Bolton to exit from the Tahoe. Bolton intended to sit in his vehicle while he showed his driver's license to Deputy Collins. Bolton was holding a driver's license in his hand, so he did not expect or understand this new demand to exit from the Tahoe. Doc 69 – Pg 60; Doc 73 – Pg 96, 99-100; Doc 75-FD2; Doc 75-FD3; Doc 77-2 – Pg 5, ¶ 7; Doc 85-6; Doc 85-7; Doc 85-8; Doc 85-9.

The deputies showed no further interest in Bolton's driver's license and never even looked at it while Bolton was holding it in his hand. Instead, the deputies told Bolton to get out of his vehicle. Doc 75 – FD2; Doc 85-7; Doc 85-8.

---

[4] Bolton referred to Deputy Thompson as an "officer," so Bolton may have also spoken to a second unidentified officer employed by CCSO or the City of Newnan Police Department.

[5] The district court incorrectly stated that "Bolton did not hand…his driver's license" to Deputy Collins, "but instead questioned why Deputy Collins needed his driver's license." Doc 93 – Pg 4. The BWC recordings show that Bolton promptly retrieved his driver's license after he woke up and crawled into the front seat, just as he had voluntarily produced the license for Deputy Thompson.

Deputy Collins and Deputy House both accused Bolton of "loitering" even though they realized there was "nothing illegal about parking (his) car in a lot like that and going to sleep." The deputies never asked Bolton to identify himself, never asked why Bolton was parked at that location, never noted the tag number of the Tahoe to verify the registration or ownership of the vehicle, and never tried to verify whether another deputy had already spoken to Bolton about parking at that location. Doc 43-1 – Pg 8; Doc 72 – Pg 57, 59, 66, 68-69, 73; Doc 73 – Pg 90, 94, 108-110, 161, 297-298; Doc 75-FD2; Doc 75-FD3; Doc 77-2 – Pg 5, ¶¶ 8-9; Doc 82; Doc 85-6; Doc 85-7; Doc 85-8.

Bolton never refused to exit from the Tahoe, but he stayed in the vehicle while he asked, "How am I loitering?" and continued to explain that he had already spoken to the other officers. Without providing any explanation or reason for Bolton to exit from the Tahoe, both deputies raised their voices and demanded obedience.[6] Doc 73 – Pg 123, 164-165; Doc 75-FD2; Doc 75-FD3; Doc 85-7; Doc 85-8.

Deputy Collins walked toward his patrol car for gloves to break a window of the Tahoe and forcibly remove Bolton from the vehicle. Deputy House continued to instruct the sleepy and confused Bolton to exit from the vehicle. The deputies chose

---

[6] The district court never mentions or considers the fact that the deputies repeatedly refused to explain why they wanted Bolton to exit from the vehicle. Doc 93 – Pg 3-6. Bolton was confused by this demand, particularly after the deputies showed no further interest in looking at Bolton's driver's license to verify his identity.

to demand or force Bolton to get out of the vehicle, even if it required breaking a window, instead of providing a reasonable explanation for the demand. Doc 72 – Pg 70-72; Doc 73 – Pg 111; Doc 75-FD2; Doc 75-FD3; Doc 85-7; Doc 85-8.

Most CCSO traffic stops are conducted with a driver seated in his vehicle, so a driver may be concerned or confused when a deputy tells the driver to exit from his vehicle. A CCSO deputy may explain why he wants a driver out of his vehicle, and the most common explanation is a concern for officer safety. "Officer safety" reasonably encompasses a concern about passing cars, or concern about whether a motorist has a weapon in the vehicle. Doc 69 – Pg 86; Doc 85-14; Doc 85-15.

Deputies receive annual "de-escalation training," but they are not trained or obligated to explain why they want a driver to exit from his vehicle during a traffic stop. Drivers commonly ask why they are being instructed to exit from their vehicles, and deputies *should* provide an explanation to seek voluntary compliance. CCSO policies do not require a deputy to explain why he wants someone to exit from his vehicle, and deputies are trained to request, demand, and force compliance without providing any explanation. Providing an explanation is certainly "consistent with the principle of de-escalation," but CCSO deputies are not obligated to apply this training in traffic stops. Doc 69 – Pg 84-87; Doc 72 – Pg 77; Doc 73 – Pg 165-166.

Deputy Collins agreed that he had no obligation to explain why someone must step out of a vehicle. When "drivers objected to getting out of a vehicle," Deputy

Collins might inform the drivers "that they needed to get out of the vehicle for officer safety reasons." However, Deputy Collins also realized that his decision to provide an explanation when he told someone to exit from a vehicle was "a judgment call." Doc 73 – Pg 162-166.

Deputy House said he intended to "make the situation safer" when he told Bolton to step out of the Tahoe. However, Deputy House could not explain why he refused to "tell Mr. Bolton the reason he needed to get out of the vehicle was for officer safety if that was (his) primary concern." Instead, Deputy House only claimed that he was not obligated to give Bolton a reason. Doc 72 – Pg 74-78.

Deputy House stepped forward to speak to Bolton as Deputy Collins went back to his patrol car. Bolton did not realize that Deputy Collins was retrieving a glove to break a window and forcibly remove Bolton from the vehicle. Doc 72 – Pg 70; Doc 73 – Pg 111, 165; Doc 75-FD2; Doc 75-FD3; Doc 85-7 – Pg 3.

Deputy House refused to explain why he wanted Bolton to exit from his vehicle instead of checking his driver's license. Deputy House asked, "You going to get out, or you going to jail?" Doc 72 – Pg 79; Doc 75-FD3; Doc 85-8 – Pg 2.

Bolton chose to "get out" of the parking lot because he was afraid of going to jail. Bolton was not sure whether he was specifically "told to leave or not," but he concluded that his best option was to drive away to get out of the parking lot and avoid going to jail. Doc 70 – Pg 21-24; Doc 75-FD2; Doc 75-FD3.

Deputy House claims that he intended to tell Bolton to "get out" *of the Tahoe* or go to jail. However, Deputy House's statement is obviously ambiguous. The deputies never told Bolton that he was under arrest or that he could not drive away to "get out" of the parking lot. The deputies certainly threatened Bolton, but nobody advised him that he could not leave the parking lot. Doc 72 – Pg 81; Doc 73 – Pg 117; Doc 75-FD2; Doc 75-FD3; Doc 85-8.

Bolton started the Tahoe engine to drive away from the parking lot. Deputy Collins was close to the rear of the Tahoe. Deputy House was standing close to Bolton and the driver's window. A light was shining in Bolton's face, and he does not remember seeing any firearms. Bolton did not realize that the deputies were aiming their service pistols directly at Bolton's head. Bolton did not hear Deputy Collins and Deputy House telling him to turn off his engine.[7] Doc 70 – Pg 17-26; Doc 72 – Pg 49-50, 79, 83, 88; Doc 73 – Pg 112; Doc 75-FD2; Doc 75-FD3; Doc 85-7; Doc 85-8; Doc 85-10.

Bolton shifted the Tahoe into gear and drove away. Deputy Collins and Deputy House got in their patrol cars to chase Bolton as he drove away at a normal

---

[7] Bolton suffered a traumatic head injury. Bolton has a limited recollection of his observations and thought process prior to the Shooting. Bolton only remembered conversing with a single deputy. Bolton never spoke to or looked at both deputies at the same time, so Bolton may have thought that both deputies were the same person. Doc 70 – Pg 19-21, 30; Doc 75-FD2; Doc 75-FD3.

speed on an empty access road. Deputy Collins chased at a higher speed on both sides of the road and performed a PIT maneuver by striking the rear right corner of the Tahoe. Deputy Collins never received permission from a supervisor or training to perform the PIT maneuver as required by the CCSO Vehicle Pursuit policy. Exhibit 7; Exhibit 8; Doc 40 – Pg 12-13; Doc 43-1 – Pg 15-17; Doc 72 – Pg 88; Doc 73 – Pg 143-144, 282-287; Doc 75-FD2; Doc 75-FD3; Doc 85-7; Doc 85-8.

The Tahoe spun around and stopped facing Deputy Collins' patrol car. Deputy House and Deputy Spinks both arrived immediately in their own patrol cars. The Tahoe was pinned and immobilized between all three (3) patrol cars. Doc 72 – Pg 104-105; Doc 73 – Pg 144, 308-309; Doc 75-FD2; Doc 75-FD3; Doc 85-7; Doc 85-8; Doc 85-11.

The Tahoe engine was still running, and its wheels were spinning after Bolton lost control of the vehicle during the PIT maneuver. However, the Tahoe remained stationary and pinned between all three (3) patrol cars. The wheels of the Tahoe were pointed straight ahead toward Deputy Collins' patrol car and never turned. The front bumper of Deputy Collins's patrol car probably bumped the front of the Tahoe because it moved back a couple of feet before it stopped. Bolton never moved the Tahoe after it stopped. Doc 40 – Pg 13, 16; Doc 43-1 – Pg 18; Doc 72 – Pg 103-105; Doc 75-FD2; Doc 75-FD3; Doc 85-13; Doc 85-14; Doc 85-2 – Pg 31 ¶ 82.

Deputy House stopped his patrol car next to and facing the driver's door of the Tahoe. Within three (3) seconds after he stopped, Deputy House jumped out of his patrol car, stood behind the driver door, aimed his service pistol, and yelled at Bolton to "turn off the car." Exhibit 8; Exhibit 13; Doc 72 – Pg 109; Doc 73 – Pg 148; Doc 75-FD3 (02:14-02:17); Doc 85-8; Doc 85-12.

Deputy Collins stopped his patrol car facing the front of the Tahoe. Within four (4) seconds after he stopped, Deputy Collins jumped out of his patrol car, stood behind the driver door, aimed his service pistol, and fired a bullet through the Tahoe windshield into Bolton's right eye ("the Shooting"). Deputy Collins fired his weapon without giving Bolton any verbal command, but he also fired at the same moment Deputy House told Bolton to "turn off the car."[8] Doc 73 – Pg 148, 160; Doc 75-FD2 (03:16-03:20); Doc 75-FD3; Doc 85-7; Doc 85-8; Doc 85-13.

CCSO trained the deputies to exercise a great deal of discretion in firing their weapons. Based on that training, CCSO, Deputy Collins, and Deputy House all claimed the deputies had complete discretion to either give Bolton a verbal warning or shoot him. Thus, Deputy House was given complete discretion to give Bolton a verbal instruction to turn off the engine while Deputy Collins was given complete

---

[8] The district court fails to mention how quickly Bolton was shot after his car was immobilized. Deputy Collins got out of his patrol car and shot Bolton immediately before he had an opportunity to hear Deputy House or turn off his engine.

discretion to immediately shoot Bolton in the head before he could comply with any warning or instruction. Doc 69 – Pg 83, 103-108; Doc 73 – Pg 152, 160-161.

The bodycam footage verifies that Bolton never posed a threat to anyone before the deputies initially drew their pistols and pointed them at Bolton's head. Bolton still posed no threat to anyone during the vehicle chase or the Shooting. Doc 72 – Pg 111; Doc 73 – Pg 161; Doc 75-FD2; Doc 75-FD3; Doc 85-7; Doc 85-8.

Bolton was critically injured when the bullet entered his right eye as he was sitting in the driver's seat of the Tahoe. Deputies at the scene initially ignored Bolton while they comforted Deputy Collins about his role in the Shooting. In response, Deputy Collins smiled and commented that he "put one on him," a reference to firing the bullet through Bolton's right eye. Doc 72 – Pg 115; Doc 75-FD2; Doc 75-FD3; Doc 89FD.[9]

Bolton was immobile and twitching in the Tahoe after the Shooting. Deputy Spinks dragged Bolton out of the Tahoe face-down on the pavement, then put a knee on Bolton's back to handcuff him. Deputy Spinks had no EMT training or medical reason to remove Bolton from the Tahoe, and he knew Bolton suffered a gunshot wound to his head. Deputy Spinks was concerned with restraining Bolton, but

---

[9] Deputy Spinks' body-worn camera (BWC) produced this audio/video recording of interactions with Bolton in the parking lot. The notice of filing this recording is docketed as Doc 89, but the actual recording was transmitted to this Court on an undocketed flash drive identified herein as Doc 89-FD.

unconcerned with whether the movement would affect Bolton's injury. Doc 71 – Pg 38-42; Doc 72 – Pg 115; Doc 75-FD3; Doc 89FD.

None of the deputies were disciplined or reprimanded for any conduct or violations of CCSO policy related to Bolton or the Shooting. Doc 71 – Pg 74-75; Doc 72 – Pg 111; Doc 73 – Pg 177.

### The Comparable Traffic Stop of Dr. Onyeka

On December 18, 2020, Deputy Spinks was involved in a comparable incident. Deputy Spinks initiated a routine traffic stop of Emmanuel Onyeka, M.D., a hospital emergency room physician. Dr. Onyeka was driving home from a hospital shift in the middle of the night. While Deputy Spinks wrote a traffic citation for an expired tag registration, he told Dr. Onyeka to exit from his vehicle. Doc 85-14.

Dr. Onyeka did not understand why Deputy Spinks suddenly wanted him out of the vehicle, so he was "apprehensive about getting out of the car at that location with no witnesses and very little traffic."   Dr. Onyeka never refused to exit from the car, but he repeatedly asked why the deputy wanted him to get out. Deputy Spinks refused to answer this question or to provide any explanation. Doc 85-14.

Deputy Spinks placed Dr. Onyeka in a headlock to forcibly remove him from his vehicle. Dr. Onyeka did not resist while deputies pushed him to ground, put him in handcuffs, and detained him in a patrol car. After this abuse, Dr. Onyeka was given a traffic citation for his expired registration and released. Doc 85-14.

Dr. Onyeka was trying not to take any action that could be perceived as a threat. Dr. Onyeka is certain that he would have gotten out of the car if he had been given any reasonable explanation for the instruction to get out of the car. Dr. Onyeka is also certain that he would have gotten out of the car if he understood that the deputies would forcibly remove him from the car. Doc 85-14.

Dr. Onyeka promptly wrote a letter to the local police department to complain about this incident. The letter was forwarded to CCSO, and it investigated the traffic stop. CCSO made "findings" and took no further action because "Deputy Spinks did not violate any department policy." Doc 85-14; Doc 85-15.

## **Expert Witnesses**

Bolton employed Dr. Andrew J. Scott, III and Curtis Marshall as experts in police practices, police training, and use of force. Both of Bolton's expert witnesses independently evaluated evidence in this case, reached conclusions based on the evidence, and drafted expert reports with opinions summarized as follows:

a)    The deputies had no reason to detain Bolton after the initial stop.

b)    Both deputies initiated the vehicle pursuit contrary to CCSO policy and well-established police practices and procedures.

c)    Deputy Collins conducted the PIT maneuver and used deadly force contrary to CCSO policy and well-established police practices and procedures. Doc 40; Doc 43-1; Doc 85-4 – Pg 2-3, ¶¶ 4-5.

16

**3.** **Standard and Scope of Review**

The district court granted a summary judgment to Defendant-Appellees. To sustain this judgment, Defendant-Appellees must show there was no genuine dispute as to any material fact and they were entitled to judgment as a matter of law. Fed.R.Civ.PG 56(a). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, (when) he is ruling on a motion for summary judgment…" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985).

This Court of Appeals should reverse the district court's order and remand the case for trial if disputed material facts could reasonably affect the outcome of the litigation. Conflicting evidence as to material facts can only be resolved by a trial on the merits, not by summary judgment. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson, supra,* 477 U.S. at 248.

This Court of Appeals must "view the evidence and all factual inferences therefrom in the light most favorable to" Bolton. Any and all reasonable doubts must be resolved in favor of Bolton. *Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016); *Cast Steel Products, Inc. v. Admiral Ins. Co*., 348 F.3d 1298, 1301 (11th Cir. 2003); *United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir. 1984); *Hill v. Linahan*, 697 F.2d 1032, 1035 n. 4 (11th Cir. 1983).

## SUMMARY OF THE ARGUMENTS

This is a civil rights and tort action based on 42 U.S.C. § 1983, the Fourth Amendment to the United States Constitution, and Georgia state law. The primary issues are whether a county sheriff and his deputies are entitled to immunity for their roles in chasing and shooting an unarmed citizen who chose to leave the scene of a parking lot where he was sleeping in his vehicle to avoid an arrest or conflict.

The plaintiff-appellant, Bolton, was a 37-year-old man living in his vehicle, a Chevrolet Tahoe SUV ("the Tahoe") parked in an enormous mall parking lot.  A Coweta County Sheriff's Office (CCSO) deputy approached Bolton to verify his identity and ownership of the Tahoe. After a pleasant conversation, the deputy allowed Bolton to remain parked in a remote area of the parking lot.

Later that night, two (2) other CCSO deputies approached Bolton while he slept in the Tahoe. Bolton explained that he had previously spoken to another deputy as Bolton climbed into the front seat to retrieve and produce his identification. At that point, the deputies instructed Bolton to get out of the Tahoe without showing any further interest in his identification or asking any questions.

Bolton was reasonably concerned about the unexplained instruction to get out of the Tahoe in the presence of two (2) armed deputies in an isolated location in the middle of the night. The deputies were trained to instruct Bolton that he needed to get out of the Tahoe for "officer safety." The standard police practice is intended to

18

"de-escalate" a possible conflict by assuring a citizen that there is a legitimate reason to follow an instruction to get out of a vehicle.

CCSO deputies were apparently allowed to disregard their training and ignore this standard police practice. The deputies refused to give Bolton any explanation or reason to get out of the Tahoe. When Bolton continued to question the instruction, the deputies became hostile and intimidating. The deputies prepared to forcibly drag Bolton out of the Tahoe and threatened him with arrest unless he "got out."

Bolton concluded that his best option was to "get out" of the parking lot by driving away. Both deputies gave chase and Deputy Collins used his patrol car to perform an unauthorized PIT maneuver and stop the Tahoe. The PIT maneuver was prohibited by CCSO policy and standard police practices because it is a dangerous procedure, the deputy lacked the requisite training, and the deputy failed to request authorization to perform this maneuver that was unjustified by the circumstances.

The Tahoe spun around and stopped with the engine still on and wheels spinning. The Tahoe was immediately immobilized between three (3) patrol cars. Within the next four (4) seconds, a deputy told Bolton to turn off his engine while another deputy shot Bolton in the head. The deputies claimed that Bolton posed a threat because the Tahoe was a deadly weapon while the engine was running.

Bolton identified four (4) distinct ways that the defendant deputies disregarded established law, standard police practices, and CCSO policies to violate

19

Bolton's civil rights. These include:

1. Conducting the initial stop of Bolton in an unlawful, threatening, and confusing manner instead of conducting a reasonable and appropriate investigation of Bolton and his vehicle;

2. Chasing Bolton's vehicle when Bolton was not reasonably suspected of committing any criminal offense;

3. Stopping Bolton's vehicle by a dangerous, unauthorized PIT maneuver when Bolton was not creating any danger or reasonably suspected of committing any criminal offense; and

4. Using excessive, deadly force against Bolton by shooting him in the head after his vehicle was immobilized without even giving him an opportunity to turn off the engine.

A federal district court granted summary judgment to the defendant deputies based primarily on qualified immunity. The defendant sheriff was sued only in his official capacity. The district court also granted summary judgment to the defendant sheriff after finding no CCSO custom, policy, or practice that provided a moving force behind the constitutional violation.

The district court order granting summary judgment presents a comprehensive analysis of the applicable case law, but it is deeply flawed in mischaracterizing and omitting critical facts. The district court disregarded the opinions of Bolton's expert

witnesses on police practices, training, and use of excessive force. The testimony of these experts specifically explained how the defendant deputies violated standard police practices, written CCSO policies, and their own training with impunity.

The district court also disregarded evidence of an incident that demonstrated an accepted pattern and practice of similar misconduct by CCSO deputies. A black physician was stopped by the deputy late at night while driving home from a hospital shift. The deputy instructed the physician to exit from his vehicle. When the physician asked why he needed to get out, he was forcibly dragged from the vehicle.

The deputies all received de-escalation training, so they knew that a motorist might be apprehensive about getting out of a vehicle at night in a secluded location. The deputies also knew they could cite "officer safety" as a reasonable explanation to relieve the fears of the motorist and seek voluntary compliance. However, the deputies were given complete discretion to either give an explanation to the motorist or to forcibly drag him from the vehicle. When the deputies refused to explain why they wanted a citizen to exit from a vehicle, the deputies were making a conscious decision to intimidate the citizen and initiate an unnecessary confrontation.

The federal courts repeatedly and consistently identified three (3) criteria that must be met to justify the use of deadly force. An officer may constitutionally use deadly force when he (1) has probable cause to believe that the suspect poses a threat of serious physical harm; (2) reasonably believes that deadly force is necessary to

21

prevent escape; *and* (3) the suspect is given some feasible warning about the possible use of deadly force.

Deadly force is unjustified unless all three (3) of these prerequisite criteria are met. In this case, Deputy Collins had to be prepared to use deadly force when he performed the PIT maneuver. Moments later, Deputy Collins shot Bolton in the head without meeting any of the three (3) prerequisites.

Finally, the defendant deputies intentionally misrepresented relevant facts and circumstances to justify the Shooting. The deputies realized that Bolton was shot while his vehicle was immobilized, he posed no imminent threat, and he was given no opportunity to turn off his engine. If such misrepresentations are ignored, then qualified immunity will be expanded to allow law enforcement officers to shoot any citizen who is behind the wheel of a vehicle while the engine is running.

## <u>ARGUMENT & CITATION OF AUTHORITY</u>

**A.    THE DEPUTIES ARE ARGUABLY LIABLE FOR USING EXCESSIVE, DEADLY FORCE BECAUSE QUALIFIED IMMUNITY DOES NOT APPLY TO A VIOLATION OF <u>CLEARLY ESTABLISHED LAW AND SHERIFF POLICIES</u>**

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

22

party injured in an action at law…" 42 U.S.C. § 1983.

"Section 1983 creates no substantive rights. (Cit.) Rather, it provides a vehicle through which an individual may seek redress when his or her federally protected rights have been violated by an individual or individuals acting under color of state law." *Gainor v. Douglas County, Georgia,* 59 F.Supp.2d 1259, 1269 (N.D.Ga. 1998). See also *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).

Bolton asserted a § 1983 civil rights claim against State law enforcement officers for use of excessive force. Any "claim that law enforcement officials used excessive force in the course of an arrest, investigatory stop, or other 'seizure'…of a free citizen...invok(es) the protections of the Fourth Amendment" to the U.S. Constitution. *Graham v. Conner*, 490 U.S. 386, 388, 394 (1989). See also *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). Doc 1 – Pg 1, ¶ 1.

The parties agree that Bolton "had not been arrested prior to the shot fired by Deputy Collins." Although "the PIT maneuver constituted a seizure, Bolton was not yet under law enforcement control at the time of the shooting." The "facts of the instant case are governed by the Fourth Amendment." Doc 74-1 – Pg 26.

"When government officials abuse their offices, 'action(s) for damages may offer the only realistic avenue for vindication of constitutional guarantees'… (W)hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal

reasonableness' of the action (cit.) assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 638-39, 107 S. Ct. 3034, 3038 (1987), quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 814, 818 (1982). See *Oliver, supra*, 586 F.3d at 904.

In resolving "a summary judgment motion based on qualified immunity," a district court is "required to resolve all issues of material fact in favor of the plaintiff." The "legal question of whether the defendant [is] entitled to qualified immunity" must be answered "under that version of the facts." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002); *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998); *Thornton v. City of Macon*, 132 F.3d 1395, 1397 (11th Cir. 1998).

"Qualified immunity protects officers engaged in discretionary functions from civil liability only if the officers' actions do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Perez, supra,* 809 F.3d at 1218, quoting *Harlow, supra,* 457 U.S. at 818.

In this case, Bolton produced ample evidence that the defendant deputies created an extremely dangerous situation that culminated in using excessive, deadly force against Bolton. Their acts may be "discretionary," but the deputies knowingly and intentionally violated clearly established law and CCSO policies during the stop, pursuit, and shooting of Bolton.

### 1. The initial stop was lawful, but intentionally conducted in an unlawful, threatening, and confusing manner

Plaintiff's experts both recognized that "Bolton's presence in the parking lot may have warranted an initial police contact." An "investigatory stop was authorized," and the deputies also "had the legal authority to request identification from Mr. Bolton." The deputies even had legal authority to instruct Mr. Bolton to "exit his vehicle" for purposes (*e.g.* officer safety) unrelated to an investigation into whether Bolton was loitering. Doc 40 – Pg 10; Doc 43-1 – Pg 6.

However, the deputies decided to intimidate Bolton by conducting this investigatory stop in a threatening and confusing manner. Defendants rely heavily on a theory that Bolton was suspected of loitering and obstructing an investigation of the loitering. In fact, the deputies never conducted a legitimate investigation into whether Bolton was loitering as he slept in his vehicle.

"A person commits the offense of loitering or prowling when he is in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." O.C.G.A. § 16-11-36(a).

However, a person cannot be arrested for loitering unless he has been afforded "an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting the person to identify himself and explain his presence

and conduct." O.C.G.A. § 16-11-36(b). Bolton could not be charged with loitering unless he refused to identify himself or to explain why he was parked in the lot.

Based on the statutory criteria, Deputy Collins and Deputy House completely avoided any legitimate investigation into whether Bolton was loitering in the parking lot. Bolton readily produced his driver's license, but the deputies were no longer interested in looking at it after they told Bolton to exit from the vehicle. The deputies never looked at the tag of the Tahoe to determine whether Bolton was the owner. The deputies never even asked Bolton to "explain his presence and conduct." The deputies "failed 'to dispel any alarm or immediate concern' with basic questioning." Doc 43-1 – Pg 8, quoting O.C.G.A. § 16-11-36(b).

In fact, Bolton had already "identif(ied) himself and explain(ed) his presence and conduct" to another CCSO deputy. Bolton explicitly and repeatedly explained that he spoke to another officer (*i.e.* Deputy Thompson) about staying in the parking lot. However, Deputy Collins and Deputy House never even tried to contact the CCSO dispatch office to confirm whether Bolton had already provided information to confirm he was not loitering.[10] Doc 40 – Pg 11, ¶ 1.5.

---

[10] Deputy House also suggested that Bolton was "obstructing an investigation." Exhibit 8, Pg 3. However, the only "investigation" was into whether Bolton was loitering. Bolton could only obstruct a loitering investigation by refusing to identify himself or refusing to explain why he was in the parking lot. The deputies never even asked Bolton these questions or looked at Bolton's identification.

26

By comparison, Deputy Thompson promptly verified Bolton's identity by asking him to produce his driver's license. Deputy Thompson also confirmed that Bolton was living out of his vehicle on consecutive days at precisely the same location, so he was probably sleeping there at night. Deputy Thompson efficiently confirmed that Bolton was not "loitering" in the parking lot, so he was allowed to remain. Deputy Collins and Deputy House were more interested in exerting their authority, intimidating Bolton into compliance, and dragging him out of the Tahoe.

"The observations of Deputy Thompson and Deputy House during their contact with Mr. Bolton…did not support any further investigation of Loitering." Doc 43-1, Pg 6. The purported "investigation" by the deputies had the desired effect. Bolton was so intimidated and confused that he reasonably concluded his best option was to leave the parking lot. The flawed "investigation" proximately caused and culminated in an unjustified, dangerous vehicle chase and a bullet in Bolton's brain.

Furthermore, a routine traffic stop is usually conducted while the driver remains seated in his vehicle. A driver may be asked to exit from his vehicle, but the driver is likely to ask for a reason, particularly when the vehicle is stopped in a remote location. By providing an explanation, a deputy may ease the driver's mind and encourage voluntary compliance with the deputy's request. Doc 69, Pg 84-87.

Deputy Collins and Deputy House knew that drivers would sometimes ask why they were being instructed to exit from their vehicles during traffic stops.

Sometimes these deputies would give the driver a reasonable explanation (*e.g.* "officer safety") to alleviate his concerns and promote voluntary compliance with the instruction. Despite annual "de-escalation training" consistent with this approach, these deputies knew they were also authorized to forcibly remove a driver from a vehicle without any explanation or effort to encourage voluntary compliance.

For some reason, "explaining to drivers why they should get out of the car" during a traffic stop is not a "part of the (de-escalation) training" at CCSO. Providing an explanation to a driver is "consistent with the principle of de-escalation," but a deputy is not obligated to apply this principle in traffic stops. Doc 69 – Pg 87.

Deputy Collins claimed that Bolton "kept refusing to" exit from the Tahoe. Doc 73 – Pg 298. Bolton was certainly reluctant to exit from the Tahoe because he did not understand the reason for the request. Bolton previously conversed with another deputy while parked at the same location, identified himself, and confirmed that he was living in his car. Bolton did not "keep refusing to" exit from his vehicle. Instead, Bolton kept asking the deputies why they wanted Bolton to step out of the vehicle at night in an isolated location when he was already holding his driver's license in his hand while the deputies ignored it.

Deputy Collins and Deputy House made a conscious decision to forcibly remove Bolton from the Tahoe without explaining their demand to exit the vehicle. Deputy Spinks subsequently made the same decision when he forcibly removed Dr.

Onyeka from his vehicle during a routine traffic stop. In short, CCSO deputies routinely used excessive force against selected drivers. It is no coincidence that Bolton and Dr. Onyeka are both black males.

It is significant that Dr. Onyeka asked essentially the same question during a CCSO traffic stop six (6) months later. In that traffic stop, Deputy Spinks refused to explain why he wanted the doctor to exit from his vehicle. Instead, the doctor was forcibly dragged from his vehicle and detained before he received a minor traffic citation for an expired tag. Doc 85-14; Doc 85-15.

Dr. Onyeka verified that he would have voluntarily exited from his vehicle if he had received an explanation for the request, or if he had realized the deputy intended to forcibly remove Dr. Onyeka from the vehicle. Bolton was obviously more than willing to identify himself and his vehicle, but the deputies refused to explain their instruction because they wanted to drag Bolton out of the vehicle.

### 2. The Tahoe chase was an unjustified, dangerous violation of proper police practices and CCSO vehicle pursuit policy

Bolton understandably "felt concern for his safety given the aggressive nature of the contact (with the deputies) and the sudden pivot from verbal commands to the threat of breaking the vehicle's window and forcibly removing him from the vehicle." Even if the deputies intended to arrest Bolton, he was unaware and entitled to resist an unlawful arrest. "Mere flight by Bolton would have been the lowest form of resistance at that point." Doc 43-1 – Pg 13.

Bolton was understandably confused and intimidated when he decided to drive away from the parking lot. At that point, Bolton certainly was not a legitimate "suspect" for any criminal offense, and he certainly not a suspect for any offense that authorized a vehicle chase.

A police practices expert, Dr. Andrew J. Scott, III, concluded that "the pursuit of Mr. Bolton once he left the deputies in the parking lot should not have occurred, per CCSO pursuit policy." In fact, the "pursuit was inconsistent with CCSO pursuit policy and well-established police practices and procedures which negligently contributed to the shooting of Mr. Bolton." Doc 40 – Pg 9, 11.

The alleged "misdemeanor crimes of Loitering and Obstruction" could not justify the deputies' decision to pursue the Tahoe. Bolton never struck Deputy House with the Tahoe. The deputies made this allegation to fabricate a felony aggravated assault charge and justify the pursuit.  Doc 40 – Pg 9-12.

Another police practices expert, Curtis Marshall, reached the same conclusion. The pursuit of the Tahoe was "based almost entirely on the notion that Deputy House was physically struck or at serious risk of injury from the Tahoe as Mr. Bolton drove away from the parking space." The evidence (including BWC video footage and the deputies' statements) overwhelmingly established that Deputy House was never struck or endangered by the vehicle." Doc 43-1 – Pg 11-13. See also Doc 75 – FD2.

According to CCSO policy, deputies may "conduct motor vehicle pursuits only when the necessity of immediate apprehension of the suspect outweighs the level of danger to the community created by the pursuit." Doc 73 – Pg 282. The vehicle pursuit of Bolton as a suspected "loiterer" cannot arguably meet this standard without fabricating a more serious crime. "The need to apprehend the fleeing driver (Mr. Bolton) based on misdemeanor crimes, did not outweigh the inherent dangers of a vehicle pursuit." Doc 40 – Pg 9; Doc 43-1 – Pg 13.

The deputies violated another CCSO policy by failing to "advise the dispatch center of the…offense committed." Doc 43-1 – Pg 14; Doc 73 – Pg 283. The deputies probably realized that they would not be authorized to engage in a vehicle pursuit of a suspect for loitering, so the deputies fabricated a claim that Bolton used the vehicle as a deadly weapon by driving toward a deputy as he drove away from the lot.

The deputies ignored the CCSO Vehicle Pursuit policy because they decided it was more important to prevent Bolton from leaving the scene of a nonexistent loitering offense. The unjustified, inherently dangerous vehicle pursuit proximately caused and culminated in the Shooting and the bullet in Bolton's brain.

### 3. The PIT maneuver was dangerous, unauthorized, unjustified, and prohibited by a written CCSO policy

Bolton was driving on a vacant access road next to the parking lot when Deputy Collins performed the PIT maneuver to forcibly stop the Tahoe. There was no traffic, and the Tahoe was traveling at a reasonable speed. Bolton had committed

no crime prior to the chase, and he was only trying to "get out" of the parking lot and away from the deputies. At worst, Bolton may have failed to come to a complete stop at a stop sign or crossed over the center of the vacant access road during the brief and unnecessary chase.

The propriety of a PIT maneuver is explicitly encompassed within the CCSO Vehicle Pursuit Policy. A PIT maneuver is an "offensive tactic" that must be approved by a CCSO supervisor. Deputy Collins violated CCSO's Vehicle Pursuit policy by driving "on the wrong side of (the) roadway" to perform the PIT maneuver without "department training" or supervisory permission. Deputy Collins had no "specific training in performing PIT maneuvers" and he never even asked for permission. PIT maneuvers are inherently dangerous, so they "should only be instituted when the use of deadly force is warranted. In this instance, deadly force was not warranted when Deputy Collins implemented the PIT maneuver." Doc 40 – Pg 12-13; Doc 43-1 – Pg 15-17; Doc 73 – Pg 27, 284-287: Doc 75 – FD2.

Deputy Collins incorrectly decided that "deadly force was warranted" when he performed the PIT maneuver to stop Bolton from driving away from the parking lot. The PIT maneuver was dangerous, unauthorized, unjustified, and prohibited by a written CCSO policy. Deputy Collins lacked the requisite training and supervisory permission to perform the PIT maneuver at a time when deadly force was certainly unwarranted.

The Shooting occurred immediately after the Tahoe was stopped and immobilized by the PIT maneuver. In this context, the PIT maneuver proximately caused the Shooting and the resulting injuries.

### 4. Deputy Collins unreasonably and unjustifiably used excessive, deadly force in shooting Bolton

The district court concluded that Deputy Collins was justified in shooting Bolton after the Tahoe was stopped and immobilized by the PIT maneuver. The district court held that "a law enforcement officer in Collins' position" could have "a reasonable belief that Bolton (1) was still attempting to flee, (2) was using his vehicle as a deadly weapon, (3) posed a threat of serious physical harm to himself and other officers on the scene, including Deputy House, (4) had violated multiple traffic laws, and (5) had committed" criminal offenses while fleeing from the deputies. Doc 93 – Pg 25-26.

The proper application of deadly force is based on more limited criteria. The district court improperly considered disputed evidence and irrelevant arguments that Bolton committed traffic and criminal offenses while he drove away from the parking lot. An officer may constitutionally use deadly force only when he:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible. *Perez, supra,* 809 F.3d at 1218-19; *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013).

The italicized word "*and*" is critical to the analysis. Deadly force is unjustified unless all three (3) of these criteria are met. Deadly force is inherently unjustified unless the suspect presents an immediate "threat of serious physical harm." *Perez, supra,* 809 F.3d at 1220-21, quoting *Morton, supra,* 707 F.3d at 1281.

No Attempt to Flee. After the PIT maneuver, the Tahoe spun around backwards, was bumped by two (2) patrol cars, and came to a complete stop. The Tahoe engine was on and the wheels were still spinning, but the Tahoe was completely immobilized between three (3) patrol cars.

Bolton was shot just four (4) seconds after Deputy Collins stopped his patrol car. During those four (4) seconds, there was no evidence that Bolton was still attempting to flee from the deputies. Deputy House immediately told Bolton to turn off his engine, but Bolton was shot in the head while Deputy House was still speaking those words. Expert testimony and video recordings discredited Appellees' bogus theory that Bolton was still trying to turn the steering wheel and flee during those four (4) seconds.

Bolton's initial attempt to "flee" was merely an effort to get out of the parking lot and away from the hostile deputies. After the Tahoe was immobilized, there was no "reasonable belief" that Bolton was still attempting to flee.

No Use of the Vehicle as a Deadly Weapon or Threat of Physical Harm. The district court relied on case law verifying that law enforcement officers may use

deadly force against a driver using his vehicle as a deadly weapon. Each case is clearly distinguishable because the drivers presented an imminent "threat of serious physical harm or death to the officers" or other people. In each case, "deadly force was reasonable" because the suspect appeared to be "using the car as a deadly weapon" by either driving "in a threatening manner" or "aim(ing) a motor vehicle at another person." Doc. 93 – Pg 26-30.

For example, the district court identified *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005) as "a case involving (similar) facts." In *Robinson*, however, the suspect drove his car toward a police officer standing directly in front of the moving vehicle. The officer was entitled to use deadly force by firing a shot through the windshield because he "had to make a split-second decision of whether he could escape before he got crushed." Doc. 93 – Pg 28, quoting *Robinson, supra*, at 1255.

Despite the extensive line of cases cited by the district court,[11] the Eleventh Circuit and the State of Georgia <u>never</u> held that an officer is authorized to use deadly force, without warning, against the unarmed driver of an immobilized vehicle who

---

[11] *Spencer v. City of Orlando*, 725 Fed.Appx. 928 (11th Cir. 2018); *Terrell v. Smith*, 668 F.3d 1244 (11th Cir. 2012); *McCullough v. Antolini*, 559 F.3d 1201 (11th Cir. 2009); *Robinson, supra; Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002); *Small v. Glynn County*, 77 F.Supp.3d 1271 (S.D.Ga. 2014), *aff'd sub nom, McGhee v. Glynn County*, 598 Fed.Appx. 752 (11th Cir. 2015); *Webb v. State*, 256 Ga.App. 653, 569 S.E.2d 596 (2002).

is no longer attempting to flee. In effect, such a decision would authorize the summary execution of any driver who flees from any law enforcement officer.

In *Perez, supra,* a sheriff's deputy "assert(ed) that his use of deadly force was constitutionally permissible because *he* believed…that his life or his fellow deputy's life was in danger…However, this argument misunderstands the relevant standard." The district court "must engage in an objective inquiry to determine the reasonableness of an officer's actions in an excessive force case: 'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id.*, 809 F.3d at 1219, quoting *Graham, supra,* 490 U.S. at 397. See also *Hall v. McGhee*, 762 Fed.Appx. 837, 841 (11th Cir. 2019); *Williams v. Matthew Sirmons*, 307 Fed.Appx. 354, 360 (11th Cir. 2009).

In *Rand v. Lavoie*, No. 14-cv-570-PB, 2017 U.S. Dist.Lexis 142755 (D.N.H. 2017), a driver led several patrol cars on a high-speed chase. The driver's vehicle finally crashed, and the court considered conflicting evidence as to whether the vehicle was immobile or still moving when a police officer shot and killed the driver. The court held that a "jury could reasonably discount" the testimony supporting the officer's account and "very well conclude" that the vehicle had stopped moving and no longer posed an imminent threat to the officer. Therefore, the plaintiff "produced enough evidence to avoid summary judgment." *Id.* at *14-15.

In the case at bar, the "deadly force used was (so) 'grossly disproportionate'" to Bolton's conduct that the deputies attempted to justify the Shooting by claiming that the immobilized vehicle was imminently dangerous. *Perez, supra,* 809 F.3d at 1223, quoting *Lee, supra*, 284 F.3d at 1199. Bolton presented evidence and expert testimony to verify that the Tahoe was not moving, he was not trying to move it, and the vehicle could not move more than a couple of feet while it was immobilized between three (3) patrol cars. The engine was still running and the wheels were still spinning for only four (4) seconds after the Tahoe was abruptly spun around backwards by the PIT maneuver.

As an expert in use of force, Dr. Scott concluded that the "force used by Deputy Collins was unnecessary and excessive. Shooting Mr. Bolton when he was not an immediate threat to the safety of Deputy Collins or others was inconsistent with well-established police practices and procedures." Doc 40 – Pg 14. Another expert, Mr. Marshall, agreed and each expert outlined a detailed factual basis for this opinion. Doc 40 – Pg 14-20; Doc 43-1 – Pg 17-29.

No Warning of Deadly Force. Deputy House attempted to comply with the final condition precedent for the use of deadly force. Bolton was entitled to "some warning about the possible use of deadly force, if feasible." *Perez, supra,* 809 F.3d at 1218-19. A warning was obviously "feasible" because Deputy House immediately yelled at Bolton to "turn off the car."

Unfortunately, Deputy Collins had no interest in warning Bolton about "the possible use of deadly force." From this deputy's perspective, Bolton disobeyed instructions and fled from the deputies. Now Bolton was apprehended, he was still in the vehicle, and the engine was running. Within four (4) seconds, Deputy House got out of his patrol car and shot Bolton in the head before he could hear the warning or turn off his engine.

### 5. Deputy Spinks used excessive force against Bolton

The "gratuitous use of force when a suspect is not resisting arrest constitutes excessive force." *Hall, supra,* 762 Fed.Appx. at 843, citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008).

Bolton was grievously injured, harmless, and twitching spasmodically on the ground due to the gunshot wound to his head. Deputy Spinks dragged Bolton from the Tahoe despite his apparent and critical head injury. Deputy Spinks had no EMT training or medical reason to remove Bolton from the Tahoe, and he knew Bolton suffered a gunshot wound to his head. Deputy Spinks then yelled at Bolton to "stop moving" as he put a foot and knee on Bolton's back and neck to handcuff him. Doc 75 – FD3; Doc 89-FD.

Deputy Spinks was concerned with restraining Bolton, but unconcerned about whether the movement would affect Bolton's injury. Deputy Spinks is certainly the least culpable of the defendant deputies, but he used excessive force against Bolton.

### 6. **Deputy House failed to intervene**

A law enforcement officer who "fails or refuses to intervene when a constitutional violation such as (a use of excessive force) takes place in his presence …is directly liable under Section 1983." Liability arises when an "officer is in a position to intervene and fails to do so." *Helm v. Rainbow City*, 989 F.3d 1265, 1272 (11th Cir. 2021); *Dukes v. Miami-Dade County*, 232 Fed.Appx. 907, 913 (11th Cir. 2007); *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998). See also *Williams, supra,* 307 Fed.Appx. at 360.

Deputy Collins decided to draw and fire his service pistol before he even stopped his patrol car. Nobody could have intervened to prevent the Shooting within the four (4) seconds it took Deputy Collins to jump out of his seat, aim, and fire a bullet into Bolton's right eye.

However, Deputy House failed to intervene several times before the Shooting. Instead, he chose to support Deputy Collins during every flawed step of the encounter. Deputy House should have intervened by:

- explaining to Bolton that he needed to exit the vehicle for "officer safety";

- confirming Bolton's identity;

- inquiring why Bolton was sleeping in his vehicle in the parking lot;

- advising Deputy Collins not to pursue the Tahoe; and/or

- advising Deputy Collins not to perform an unauthorized PIT maneuver.

Intervention by Deputy House in any of these matters could have prevented the Shooting and its tragic consequences.

### 7. The deputies' false statements provide evidence that they knowingly and intentionally violated Bolton's civil rights

Bolton presented ample evidence that the deputies repeatedly misrepresented material facts to justify their conduct and evade CCSO policies. Some of the misrepresentations seem trivial, but they each served a specific purpose. These false allegations arguably confirm that the deputies were fully aware of their misconduct and excessive use of force against Bolton.

1.     Deputy Collins falsely alleged that he investigated the parked Tahoe "due to several recent commercial burglaries in the area, specifically cell phone and electronics stores." Doc 73 – Pg 81-82, 297. This misrepresentation suggests that Deputy Collins had a specific, legitimate reason to be concerned about whether Bolton was parked at that location for an illegal purpose.

Deputy Collins admitted he could not recall any break-ins or burglaries in the Newnan Pavilion within the previous year. In fact, he could not recall such a crime in that general area during the six (6) months before the Shooting. Doc 73 – Pg 87.

Deputy House admitted that he could not recall any break-ins or burglaries in the Newnan Pavilion. Doc 72 – Pg 54. The CCSO representative, Major Fenninger, also admitted that he was unaware of any break-ins or burglaries in or near the Newnan Pavilion during the six (6) months prior to the Shooting. Doc 69 – Pg 78.

2.    Deputy Collins falsely alleged that Bolton "pretended to be asleep" when the deputy knocked on the Tahoe window. Doc 73 – Pg 297. This misrepresentation infers that Bolton was deceptive and perhaps a potential lookout for a burglary, so Deputy Collins would have a reason to be concerned about why Bolton was parked in the shopping center lot.

Bolton was obviously asleep in the back of the Tahoe when Deputy Collins knocked. Bolton sounded groggy as he responded, and nothing about Bolton's conduct or appearance suggested that he "pretended to be asleep." Doc 75 – FD2.

3.    Deputy Collins falsely alleged that Bolton claimed "he did not have to provide his identification." Doc 73 – Pg 94-95, 297. This misrepresentation suggests that Bolton was deceptive and uncooperative with the deputies.

Bolton never claimed that he did not have to produce identification. Bolton only asked why he had to produce identification again after he had already shown it to another officer. Bolton promptly retrieved his driver's license and he never refused to produce it. Deputy Collins could see the driver's license in Bolton's hand after he moved to the front seat of the Tahoe. Exhibit 7; Exhibit 8; Exhibit 9; Doc 69 – Pg 60; Doc 73 – Pg 95-96; Doc 75 – FD2; Doc 75 – FD3.

4.    Deputy Collins falsely alleged he told Bolton that "he would be allowed to go free" after Deputy Collins "completed (his) investigation." Doc 73 –

41

Pg 297. This misrepresentation suggests that Bolton had no reason to be surprised when he was instructed to exit from his vehicle for the "investigation."

Deputy Collins initially told Bolton: "give me your ID and let me check you and then I'll be on my way." At that point, Bolton reasonably believed that the deputies just wanted to see Bolton's driver's license to identify him before they would leave the parking lot and let him sleep. Bolton readily produced his driver's license when Deputy Thompson previously requested it. As Bolton produced his driver's license, he was surprised and confused by the additional instruction to exit from his vehicle. Exhibit 7; Exhibit 8; Doc 75 – FD2; Doc 75 – FD3.

5.    At his deposition, Deputy Collins falsely alleged that he had no "chance" to tell Bolton why he was instructed to exit from his vehicle. Deputy Collins obviously had ample time and opportunity to give Bolton an explanation. Deputy Collins made this false statement to avoid admitting his conscious decision to "get his glove" and use excessive force to remove Bolton instead.

6.    Deputy Collins falsely reported that the Tahoe struck Deputy House before Bolton drove away from the parking lot. Doc 73 – Pg 114-115. Deputy House falsely reported that the Tahoe pushed him "out of the way" before Bolton drove away from the parking lot. Deputy House claimed that he "stepped in front of the" Tahoe with his gun drawn while he was giving commands "to keep Bolton from leaving." Doc 72 – Pg 92, 310. These misrepresentations were presented to suggest

that Bolton committed an aggravated assault with the Tahoe, a felony offense that could justify the deputies' decision to conduct a vehicular pursuit of the Tahoe.

However, the BWC of each deputy verifies that Deputy House was already standing to the side of the Tahoe before Bolton drove away from the parking lot. In fact, Deputy House was standing next to the driver's window of the Tahoe when Bolton started the engine. Deputy House stepped back and aimed his gun as he reached over with his left hand to touch the front fender. Deputy House withdrew his hand and holstered his gun as Bolton started to drive away. Deputy House did not mention being struck by the Tahoe when he gave written and recorded statements about the Shooting to the GBI. Exhibit 10; Doc 72 – Pg 79, 90-91, 174; Doc 73 – Pg 141-143; Doc 75 – FD2 (02:16-02:40).

Video evidence shows that the Tahoe never struck or moved toward Deputy House as Bolton drove away from the parking space. Plaintiff's experts, Dr. Scott and Mr. Marshall, both reviewed the evidence and reached the same conclusion. Doc 40 – Pg 11-12; Doc 43-1 – Pg 12-13.

7.      Deputy Collins falsely reported that the Tahoe continued to ram and push Deputy Collins' patrol car after the PIT maneuver. Doc 73 – Pg 134-135, 147, 298. This allegation was intended to justify the deputy's unauthorized use of deadly force when he shot Bolton. Doc 73 – Pg 135.

It never happened. After the PIT maneuver, Deputy Collins drove his patrol

43

car forward until it bumped the front of the Tahoe. Tire marks verify that the Tahoe tires were spinning, but the vehicle did not move after this "mild impact" with Deputy Collins' patrol car. Deputy Collins' BWC and Deputy House's BWC both show that the Tahoe moved backward and stopped a short distance away without ever pushing the patrol car. Exhibit 11; Doc 75 – FD2; Doc 75 – FD3.

Plaintiff's experts examined the evidence and agreed that the Tahoe was immobilized between three (3) patrol cars when Deputy Collins used deadly force to shoot Bolton. The spinning tires only suggest that Bolton was disoriented after the Tahoe spun around during the PIT maneuver and his foot was still on the accelerator. Doc 40 – Pg 16-17; Doc 43-1 – Pg 19-20.

8.    Deputy Collins falsely reported that he was still in his patrol car while Deputy House was "giving verbal commands" to Bolton. This allegation was intended to justify the Shooting by claiming Bolton had ample time to comply with instructions and eliminate the need to use deadly force. Doc 73 – Pg 298.

Deputy House only gave Bolton one (1) verbal command to "turn off the car" at the same moment Bolton was shot in the head. Deputy Collins was already out of his patrol car and firing his pistol at Bolton's head when Deputy House shouted this single verbal command. Bolton had no opportunity to comply by turning off his engine before Deputy Collins shot Bolton in the head. Exhibit 7; Exhibit 8; Doc 75 – FD2; Doc 75 – FD3.

9.      Deputy Collins falsely reported that Bolton was "trying to break free" by turning "the steering wheel to the left" toward Deputy House. This allegation was intended to justify the Shooting by claiming that Bolton used the Tahoe to pose a threat to Deputy House. Doc 73 – Pg 149-150, 298.

Bolton was shot immediately after the Tahoe stopped. During the four-second interval before the Shooting, the BWC videos do not show Bolton trying to turn the steering wheel. Based on the positioning of the vehicles, Bolton could not possibly turn the Tahoe toward Deputy House. In fact, the Tahoe came to rest with its wheels pointed straight ahead or very slightly to the left. Bolton's experts examined the evidence and agreed that Bolton was not trying to break free, turning his steering wheel, or posing any danger to Deputy House at that time. Doc 40 – Pg 16-17; Doc 43-1 – Pg 19-20; Doc 75 – FD2; Doc 75 – FD3; Doc 85-12.

10.     Deputy Collins falsely reported that he shot Bolton when he saw Deputy House in danger "directly between the suspect vehicle (*i.e.* the Tahoe) and his patrol car." Deputy Collins was trying to justify the Shooting by claiming that the Tahoe was still "a fleeing vehicle using deadly force against" Deputy House. Otherwise, the Shooting clearly violated the CCSO Vehicle Pursuit Policy that prohibited the use of a firearm "against a fleeing vehicle or its occupants" that is not creating any imminent threat. Doc 73 – Pg 287-98.

In fact, the BWC recordings clearly verify that Deputy House was standing a safe distance away behind the door of his own patrol car. Deputy House and Bolton's experts all agree that Deputy House was not endangered by the Tahoe. Doc 40 – Pg 13, 16-17, 20, 25-26; Doc 43-1 – Pg 18-24; Doc 72 – Pg 111; Doc 73 – Pg 298; Doc 75 – FD2; Doc 75 – FD3; Doc 85-11; Doc 85-12; Doc 85-13.

**B.**    **THE COUNTY SHERIFF IS ARGUABLY LIABLE IN HIS OFFICIAL CAPACITY FOR THE ALLEGED CIVIL <u>RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983</u>**

A county sheriff is not an "agent of the State" for purposes of a § 1983 claim. A county sheriff represents the county, just as a city official represents the municipality. These government officials are only liable in their official capacities for their own contributions to the misconduct of subordinates. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 691, 701 (1978).

County and municipal liability may be based on deficient police department policies, practices, or training that caused or contributed to the conduct of a police officer which "inflicts the injury." These entities may also be liable for sanctioning, ratifying, or acquiescing to police officer conduct which promotes a constitutional violation. *Id.* at 694. See also *Board of County Commissioners v. Brown,* 520 U.S. 397, 403–04 (1997); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478, 480 (1986); *Matthews v. Columbia County,* 294 F.3d 1294, 1297 (11th Cir. 2002).

A county, through its sheriff, may be liable even if the deputies are protected by qualified immunity. The question is whether a governmental entity "was the 'moving force' behind the alleged injury." *Brown, supra,* 520 U.S. at 404. A deputy may act reasonably, but inappropriately, if the county sheriff fails to provide adequate training or implement appropriate practices.

In the case at bar, Sheriff Wood shares some responsibility for the conduct of the defendant deputies due to these deficiencies in training and supervision:

1.      Deputies were not properly trained on the legal definition of loitering, so Deputy Collins and Deputy House failed to conduct a proper investigation of that offense by merely asking Bolton to identify himself and explain why he was in the parking lot. Bolton was obviously willing to comply with a loitering investigation.

2.      Deputies were not properly trained to contact CCSO to confirm whether another deputy has already spoken to someone or investigated a matter. As a result, the deputies never confirmed that Deputy Thompson had already spoken to Bolton and investigated his presence in the parking lot

3.      Deputies were not properly trained or supervised to conduct vehicle pursuits in accordance with CCSO's own written policy. Doc 73 – Pg 282-287. Consequently, deputies may pursue any fleeing vehicle based "on their discretion at the time" without any limitations. As implemented by CCSO, the policy allows a

deputy to pursue someone in a fleeing vehicle "who simply didn't want to cooperate with the officers and decided to leave." Doc 69 – Pg 44-46.

4.      Deputies were not properly trained or supervised to conduct PIT maneuvers in vehicle pursuits in accordance with CCSO's written policy. Doc 73 – Pg 282-287. Consequently, a deputy is not bound by the written policy requirements that restrict the use of this procedure. Doc 69 – Pg 47-48.

5.      Deputies were not properly trained or supervised to apply de-escalation training to traffic stops. A deputy has no obligation to seek voluntary compliance with a demand for a motorist to exit from his vehicle. Instead, deputies may choose to break a window and drag the motorist from his vehicle. Doc 69 – Pg 83-87.

6.      Deputies were trained and supervised to exercise unlawful discretion in deciding when to use deadly force. Doc 69 – Pg 103-108. Deadly force should never be used against someone committing a traffic violation, misdemeanor, or non-forcible felony, so a CCSO written policy prohibits it. However, deputies are allowed to use "necessary force" to achieve *any* police objective and overcome (any) "resistance." In this case, any level of force can be used to identify someone sleeping in his vehicle, to remove a driver from his vehicle, to keep someone from leaving a scene, or to pursue any "fleeing vehicle." Deadly force is always a viable option, even if it is contrary to a written policy. Doc 69 – Pg 21, 24, 44-46.

7.      Sheriff Wood condoned the conduct of the deputies, even when they violated official written policies or use excessive force. No deputy was disciplined in this case despite the blatant violations of written CCSO policies, including the unauthorized vehicle chase, PIT maneuver, and use of deadly force. Similarly, Deputy Spinks was not even chastised for forcibly dragging Dr. Onyeka out of his car for an expired tag because Deputy Spinks was allowed to blatantly violate Dr. Onyeka's civil rights without violating any CCSO policy. Doc 85-14; Doc 85-15.

## C.      BOLTON STATED VIABLE STATE LAW ASSAULT AND BATTERY CLAIMS AGAINST THE DEPUTIES

As to the state law claims, the defendant deputies are entitled to "official immunity when they merely act in a negligent manner." Conversely, the deputies "lose their official immunity when they act with actual malice or intent to injure." *Touchton v. Bramble*, 284 Ga.App. 164, 167, 643 S.E.2d 541 (2007).

Deputy Collins and Deputy House deliberately intimidated and frightened Bolton by ignoring his driver's license, statements, and questions while refusing to explain why he was instructed to step out of his vehicle. These deputies chased Bolton down in an unauthorized vehicle pursuit, forcibly stopped his vehicle with an unauthorized PIT maneuver, then unjustifiably shot him in the head even though Bolton was not under arrest and committed no crime.

Deputy Spinks dragged Bolton out of the Tahoe face-down on the pavement, then put a knee on Bolton's back to handcuff him. Deputy Spinks had no EMT training or medical reason to remove Bolton from the Tahoe, and he knew Bolton suffered a gunshot wound to his head. Deputy Spinks was concerned with restraining Bolton, but unconcerned about whether the movement would affect Bolton's injury.

Under these circumstances, a jury could reasonably conclude that each deputy acted "with actual malice and intent to injure" Bolton. *Id.*

## CONCLUSION

Plaintiff-Appellant NICHOLAS S. BOLTON asserted viable claims against Defendant-Appellees that are substantially supported by evidence. The district court granted summary judgment to Defendant-Appellees by misinterpreting and failing to recognize disputed evidence, then failing to properly construe it in favor of Bolton.

Deputy Collins' use of deadly force against Bolton was at least arguably unjustified due to evidence that Bolton did not pose a threat of serious physical harm to anyone, he was no longer trying to flee, and he was not given a "feasible…warning about the possible use of deadly force" before he was shot in the head. A deputy's use of deadly force is inherently excessive and a violation of the victim's Fourth Amendment rights unless the circumstances meet all three (3) of these criteria.

The federal district court order granting summary judgment to Defendant-Appellees expands the scope of qualified immunity and sets a dangerous precedent.

This Court should reverse the district court order based on *de novo* review of the evidence properly construed in favor of Bolton. The case should be remanded to the district court so that the factual disputes may be properly resolved by a jury.

Respectfully submitted,

/s/ *James W. Howard*
James W. Howard
Georgia Bar No. 370925
Attorney for Plaintiff-Appellant

THE HOWARD LAW FIRM, P.C.
Suite 200, Kyleif Center
1479 Brockett Road
Tucker, Georgia 30084
(770) 270-5080
(770) 270-5033 (fax)
jhoward@howardfirm.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the format and type-volume limitation established by Federal Rule of Appellate Procedure 27(d). The applicable part of the brief contains 12,481 words, so it is within the prescribed page limitation. The type size and style of the document is 14-point Times New Roman.

/s/ *James W. Howard*
James W. Howard
Attorney for Plaintiff-Appellant
Georgia Bar No. 370925

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I served the foregoing *Brief of Appellant* after hand delivery of four (4) copies to the Clerk of Court, by electronically filing the same for uploading to the CM/ECF system which will automatically send e-mail notification of such filing to the appropriate parties, and by depositing a copy of same in the United States mail with adequate postage affixed thereon for delivery to the following opposing attorney of record:

> Karen E. Woodward, Esq.
> Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP
> Meridian II, Suite 2000
> 275 Scientific Drive
> Norcross, GA 30092
> kwoodward@cmlawfirm.com

This 20th day of November, 2023.

/s/  *James W. Howard*
James W. Howard
Attorney for Plaintiff-Appellant
Georgia Bar No. 370925

THE HOWARD LAW FIRM, P.C.
Suite 200, Kyleif Center
1479 Brockett Road
Tucker, Georgia 30084
(770) 270-5080
(770) 270-5033 (fax)
jhoward@howardfirm.com